IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


HAPPY STOMPINGBEAR                                                    PLAINTIFF

v.                                      Civil No. 6:18-CV-06114

LARRY REED, JOHN DOES 1-7,[1] and CO.                        DEFENDANTS
GUNNER PRITCHARD


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This is a civil rights action provisionally filed pursuant to 42 U.S.C. § 1983.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Robert T. Dawson, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

Currently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 37).

## I.  BACKGROUND

Plaintiff filed his Complaint on November 15, 2018.  (ECF No. 1).  That same day, the Court entered an Order directing Plaintiff to submit an Amended Complaint, which he did on November 30, 2018.  (ECF Nos. 4, 5).  Plaintiff is currently incarcerated in the Arkansas Department of Correction ("ADC") Ouachita River Unit, and his Complaint centers on an incident occurring there on October 19, 2017.  (ECF No. 5 at 2-5).

### A.  Complaint Allegations

Plaintiff alleges that on October 19, 2017, Defendant Reed put restraints on him "extra super tight" and crooked, and then wrenched his arm "with the intent purpose to cause me harm."

---

[1] The Initial Scheduling Order in this case originally set the deadline to identify any Doe Defendants at July 1, 2019. (ECF No. 20).  This deadline was extended to August 15, 2019.  (ECF No. 28).  The time to identify and serve any Doe Defendant is long past.

(*Id*. at 5).  He alleges this action left him with a permanent scar, and his right hand intermittently hurts and "goes numb." (*Id*.).  Plaintiff further alleges that Defendant Reed, several unknown John Doe officers, and "probably Pritchard" ran his head into a closed and locked door, with the "intent purpose" to cause him harm.  (*Id*. at 5-6).

Plaintiff then alleges that he was sitting in a chair with handcuffs on and getting his vitals checked when Defendant Pritchard grabbed him by the neck, lifted him in the air, and slammed him into the ground, breaking several ribs and crushing his right elbow.  Plaintiff alleges Pritchard did this "unprovoked" and "with evil intent to cause me harm."  (*Id*. at 6).  Then Pritchard and the Doe officers jumped on him, putting knees in his ribs, kidneys, and neck, and using "joint manipulations" and pressure points to cause him pain without leaving bruises.  (*Id*. at 6).

Plaintiff further alleges the John Doe Officers then carried him to Isolation.  On the way to Isolation, Plaintiff alleges one of the Doe Officers used his shirt to choke him into unconsciousness.  This left "huge marks" on his neck.  (*Id*. at 6).  Once in Isolation, he was thrown into a corner, where the Doe Officers again applied their knees and elbows to his ribs, necks, and kidneys.  Joint manipulations and pressure points were used.  Plaintiff alleges he did not struggle or fight back, he merely begged them to stop and "cried out in pain."  (*Id*. at 6).  Plaintiff alleges the Doe officers ripped his clothes off him and his penis was pinched, twisted, and pulled.  (*Id*. at 6).  While in Isolation, he was not permitted the use of hygiene products for seven days.  (*Id*. at 6).  Plaintiff alleges he heard Warden Jackson tell the corporals to manage the Varner inmates, even if they have to "soften them up" by beating them.  (*Id*. at 7).

Plaintiff further alleges that a Doe Officer, "I believe it to be Larry Reed since he was a ranking officer" placed him in Behavior Control without a hearing from October 19, 2017, through approximately October 30, 2017.  (*Id*. at 7).  In Behavior Control, he was stripped naked and not

permitted a bed or bedding. He was not permitted the use of hygiene products, personal property, legal supplies, or religious material. Plaintiff alleges his behavior was under control, he did not fight back while being tortured, and he did not get his property back for seven days. (*Id.* at 7). Plaintiff alleges he did not receive a hearing before or after his time in Behavior Control. (*Id.* at 8). Plaintiff alleges is an ADC custom that an officer at the level of sergeant or above is permitted to make the decision to place an inmate in Behavior Control to punish them. (*Id.* at 9).

Plaintiff alleges his denial of hygiene products in Behavior Control was done in retaliation for exercising his First Amendment rights.[2] (*Id.* at 9). One Doe Officer told him "writ writers aren't allowed property." Another Doe Officer told him to "sue us for it." Finally, a third Doe Officer told him he had orders not to help him with his hygiene or property. (*Id.* at 9). Plaintiff alleges that when his property was returned, he was missing several personal items and "they" broke his bowl. (*Id.* at 10).

Plaintiff proceeds against all Defendant in both their personal and official capacities. (*Id.* at 5, 7, 9). Plaintiff seeks compensatory and punitive damages. He also seeks a reduction of sentence, formal apology, and formal charges against "those that are guilty." (*Id.* at 11).

**B. Plaintiff's Deposition Testimony**

Plaintiff's deposition testimony provides additional context to Plaintiff's Complaint allegations. Plaintiff testified that shortly before the incident, a number of inmates were transferred from the ADC Varner[3] Unit. (ECF No. 37-1 at 4). Plaintiff does not explicitly state that he was

---

[2] Pursuant to ADC Administrative Directive 14-42, denial of hygiene privileges for periods of 72 hours at a time are part of the Behavior Control strategy. If unacceptable behavior continues, another 72-hour cycle of Behavior Control begins anew. (ECF No. 37-7 at 2-3). The denial of hygiene products to Plaintiff was, therefore, part of standard Behavior Control policy. Further, "claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield v. Nichols,* 511 F.3d 826, 829 (8th Cir. 2008). There is no dispute that Plaintiff was placed in Behavior Control due to an actual violation of ADC rules. The Court will therefore not address this claim.

[3] The regular unit, as opposed to the SuperMax Unit. (ECF No. 37-1 at 4).

one of those Varner inmates, however, he testified that "when he got over here" Lieutenant Clark confiscated all of his property. (*Id*. at 5). Two days after the confiscation, on October 19, 2017, Plaintiff saw Warden Faust and Warden Jackson talking and approached them. He inquired about his property and said he needed it, particularly his legal work. They told him he had too much property, and he could not keep it. Plaintiff "got frustrated," "cussed at them," and walked off. (*Id*. at 5). Plaintiff testified that his exact words were "[F]uck you, you ain't shit you sorry mother fuckers." (*Id*. at 5). He further testified that these words were delivered in a "slightly raised" voice, but he was not yelling. (*Id*. at 5). Plaintiff raised his right hand and "gave them the finger." He then walked off towards the barracks. (*Id*. at 5-7). Defendant Reed caught up with him after he had walked about ten feet and told him to face the wall and submit to handcuffs, which Plaintiff did. (*Id*. at 7). Plaintiff testified the handcuffs cut into his wrists and caused scarring. His wrists did not bleed, but the handcuffs "rubbed the skin off." (*Id*. at 9). Plaintiff told Reed the handcuffs were hurting him and told him he was going to protest his actions if he did not fix the handcuffs. (*Id*. at 10). Plaintiff then went limp and started yelling "passive protest." He does not know if Reed was the officer holding him when he went limp. (*Id*. at 10).

Plaintiff remained limp and refused to walk the short distance to the infirmary, continuing to yell "passive protest." (*Id*. at 15). Plaintiff was not sure of the distance to the infirmary, but described it as "around the corner . . . wasn't very far." (*Id*. at 15). He does not know if Reed was one of the several officers carrying him, as he was carried face down, still yelling "passive protest." (*Id*. at 15-16). Plaintiff admitted that it would have been easier to walk, but then he "wouldn't have got my point across." (*Id*. at 39). The officers carrying him ran his head into the infirmary door, "kind of like a battering ram." (*Id*. at 16). Plaintiff did not know the identities of the officers carrying him. (*Id*. at 16).

Once inside the infirmary, Plaintiff was seated, still handcuffed, in a chair. The nurse tried to check his blood pressure, and he was talking to her. Defendant Pritchard then came up behind him, grabbed him with both hands by the neck, lifted him from the chair, and slammed him to the ground. (*Id*. at 18). Plaintiff denied trying to spit on or bite anyone while he was in the chair, or doing anything else to provoke his removal from the chair. (*Id*. at 19). Plaintiff believes Pritchard may have misinterpreted something he was doing in talking to the Nurse to be an attempt to bite Pritchard. (*Id*. at 23). Other officers helped Pritchard, and Plaintiff felt like they were "grinding" his pressure points, possibly with elbows, possibly with just their hands. (*Id*. at 25). Plaintiff did not yell "passive protest" and did not struggle; he lay still. (*Id*. at 22). A spit mask was placed on Plaintiff while he was on the ground. (*Id*. at 23).

The nurse looked at him, but did not examine him before he was taken to Isolation. (*Id*. at 26). In Isolation, the group of officers shoved him around and ripped his clothes off. Plaintiff did not know if Reed was there, and he did not know any of the guards, because he had just come to this ADC Unit. (*Id*. 26-27). Plaintiff had "no idea" if Pritchard was there. (*Id*. at 27). Plaintiff knew Reed's name due to the disciplinary charge he received for the incident. (*Id*. at 29). He believes Reed was the one who made the decision to put him in Behavior Control, but does not know for sure. (*Id*. at 32). Plaintiff believes that the use of Behavior Control violates his Due Process rights. (*Id*. at 33).

Plaintiff alleges his right elbow was "crushed" as a result of being slammed to the ground. The nurse looked at it and felt it, and scheduled an x-ray. (*Id*. at 20). That x-ray did not show that elbow suffered any break in the bone, but Plaintiff said you could feel "bone fragments" in the elbow. (*Id*. at 20). A doctor later told him that his ribs had been broken, about a week after the

incident. (*Id*. at 21). He was given ibuprofen "or something" and lay-ins. (*Id*. at 28). Plaintiff

was treated in the ADC, and was not taken to an outside hospital. (*Id*. at 21).

### C. Nurse's Pre-Lockup Examination Notes

Nurse Gonzalez noted that Plaintiff was escorted into the infirmary by four officers for a

pre-lockup exam. (ECF No. 37-5). Further details of the interaction were noted:

> Inmate came in yelling passive protest over and over. [O]fficers placed inmate in
> chair for v/s. Inmate begins pre lock procedure with cooperations and the[n]
> beg[]ins to tell officer that he is a piece of shit and when officer told him to look
> the other direction inmate made a bit[]ing motion towards the officers hand.
> [U]nable to continue the v/s signs due to inmate becoming uncooperative with
> officers. Inmate was placed on the ground and secured by three officers. No
> injuries noted at this time. [E]scorted out in cuffs by 4 officers.

(*Id*.). Gonzalez indicated on the form that Plaintiff had no wounds, bruises, abrasions, etc. (*Id*.).

Plaintiff was then released to security. (*Id*.).

### D. Disciplinary Charge

Defendant Reed charged Plaintiff with creating unnecessary noise and insolence to a staff

member. (ECF No. 37-6). He provided the following description of the event:

> On 10-19-2017 at approximately 11:15 am, I Lt. Reed, was working mainline Chow
> Zone 2 when Inmate Stompingbear/Ward, Happy/Christopher Mystik
> Rainbow/Alan ADC#651503 approached Warden Faust and Warden Jackson and
> was asking questions concerning his property. Inmate Stompingbear/Ward . . . was
> becoming loud and started telling Warden Faust and Warden Jackson Stating "fuck
> you, ya'll aint shit, sorry motherfuckers" and then threw his arm up in an aggressive
> manner. I, Lt. Reed, then placed hand restraints on Inmate Stompingbear/Ward . .
> . .

(*Id*.).

### E. Plaintiff's Grievance No. OR-17-01853, Grievance Investigation Worksheet, and Internal Affairs Use of Force Review

Plaintiff grieved the incident in OR-17-01853. (ECF No. 48-1 at 67) The response

summary states:

> Our records indicate you were placed in hand cuffs to be escorted to restrictive
> housing after you became insolent to Warden Faust and Deputy Warden Jackson

6

and created unnecessary noise.  You received a disciplinary for your actions during this incident. Officers involved in subduing you and escorting you to the infirmary state the allegations you have made against them are untrue.  Medical personnel reported that once in the infirmary you became uncooperative. First you attempted to bite the officers then you attempted to spit on them so you were taken to the floor and a spit mask was placed on you. At that time you were escorted out of the infirmary and taken to Restrictive Housing and placed on Behavior Control. When the officers instructed you to give them your clothing, you refused all orders to do so. You were then restrained and a 911 knife was used to remove your clothing. You must learn to follow all orders given by staff.  I find your grievance without merit. "

Your appeal was received on 12/ 14/ 17.  In review of your appeal, supporting documentation and the warden's response, I concur with the warden's decision. You had to be subdued because of your actions and staff acted within policy, according to Internal Affairs investigation. Therefore, I find no merit in your appeal.

(*Id*.).

Plaintiff supplied copies of the grievance investigation worksheets completed by two officers who assisted in subduing Plaintiff in the infirmary.  These worksheets confirmed that Plaintiff was carried to the infirmary, was not compliant in the infirmary, attempted to spit at staff, was taken to the floor where he kicked at the officers, and a spit mask was placed on him.  They further state that Plaintiff refused to walk to Isolation and had to be carried.  Plaintiff's clothing was cut from him with a 911 knife when he refused to comply with staff orders to remove his clothing.  (ECF No. 48-1 at 61- 65).

Plaintiff also provided a copy of the Internal Affairs Use of Force Review concerning the incident.  This report noted that Lt. Reed restrained Plaintiff after he swore at the wardens and raised a hand to them in an aggressive manner.  Plaintiff had to be carried to the infirmary because he refused to walk.  In the infirmary, Plaintiff attempted to bite and spit on security staff, at which time he was forced to the floor and a spit mask applied.  He was then carried to East Isolation and placed in Behavior Control.  Plaintiff's clothing was removed with a 911 tool when he refused to

give up his clothing. [4]   The Report concludes that the application of force to take Plaintiff to the floor and apply a spit mask was necessary to prevent a possible assault on staff.  The use of force was found to be within policy guidelines, and his behavior warranted his placement in Behavior Control.  The Report also noted that Plaintiff "is a disciplinary problem and has an extensive history of disrupting the good order of unit operations."  (ECF No. 48-1 at 65-66).

Defendants filed their Motion for Summary Judgment on November 4, 2019.  (ECF No. 37).  On November 25, 2019, the Court entered an Order directing Plaintiff to file his Response to the Summary Judgment Motion by December 16, 2019.  (ECF No. 44).  On December 18, 2019, Plaintiff filed his Response to the Summary Judgment Motion.  (ECF Nos. 47, 48, 49).  On December 20, 2019, Defendants filed a Motion for Extension of Time to Respond to Plaintiff's Summary Judgment Response.  (ECF No. 51).  The extension was granted, and Defendants filed their Reply to Plaintiff's Summary Judgment Response on January 13, 2020.  (ECF No. 54.) Plaintiff filed a Reply to Defendants' Reply to Plaintiff's Response to the Summary Judgment Motion.  (ECF No. 55).

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a

---

[4] The report notes x-rays taken, but these were not attached to the report.

genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  ANALYSIS

**Defendants' Motion for Summary Judgment:** In their Motion for Summary Judgment, Defendants argue summary judgment in their favor is appropriate because: (1.) Defendants are entitled to sovereign immunity in their official capacities; (2.)  Plaintiff claim against Defendant Reed is limited to an allegation of excessive force with handcuff restraints; (3.)  Plaintiff's claim against Defendant Pritchard is limited to an allegation of excessive force in the infirmary; (4.) Defendants are entitled to qualified immunity because Plaintiff was not subjected to excessive force; (5.)  Defendants are entitled to qualified immunity because, to the extent Plaintiff challenges his prison and disciplinary convictions, he is barred from doing so by the *Heck* doctrine.  (ECF No. 38).

Based on the summary judgment record before the Court, neither Defendant was involved in any activity involving Plaintiff after the infirmary on October 19, 2017.[5] The Court will therefore limit its discussion of the summary judgment record to those facts leading up to and at the infirmary.

**Plaintiff's Response and Statement of Facts:** In his Response, Plaintiff argues that his case should survive summary judgment because: Defendants claim they were acting "by the book" and he should therefore be able to sue them in their official capacity. In the alternative, Plaintiff asks that the personal capacity claims remain. (ECF No. 48 at 2). Regarding Defendant Reed, Plaintiff states that "he honestly can't say for sure where he was. . . ," but believes Reed should be held responsible for his subordinates' actions in ramming Plaintiff's head into the infirmary door. (*Id*. at 2-3).

As to Defendant Pritchard, Plaintiff notes that Pritchard admitted to helping carry him to the infirmary, and should therefore be liable for ramming his head into the door. (*Id*. at 3). Plaintiff further states that Pritchard "was there, there was a group of them how would I know which one or if it was all of them that ran my head into the door. If he wasn't the one he failed to act, failed to protect, merely watching as my head was run into the door. . . ." (*Id*.).

Plaintiff argues that qualified immunity must be decided by a jury, as there are two different stories of what happened that day. (*Id*.). He argues that choke-slamming an inmate who is wearing handcuffs and "just sitting there" is "most definitely established." (*Id*. at 4). As to the use of excessive force, Plaintiff argues that he had "said [his] piece and walked off towards the barracks,"

---

[5] Plaintiff testified that he did not know if Defendant Reed was one of the officers carrying him to the infirmary. Plaintiff also testified he did not know if Defendant Reed or Defendant Pritchard were present in Behavior Control. (ECF No. 37-1 at 15-16, 26-27). Reed stated in his Affidavit that he his only interaction with Plaintiff that day was placing him in handcuffs. He did not carry Plaintiff to the infirmary and was not present in Behavior Control. (ECF No. 37-2 at 2). Pritchard stated in his Affidavit that he did not carry Plaintiff to Behavior Control and was not present in Behavior Control. (ECF No. 37-4 at 4).

therefore there was no need for Defendant Reed to either gain control or restore order by placing him in handcuffs. (*Id*. at 3). If Reed had not caught up to him, he would have returned to his barracks and written a grievance, and "none of this would have even happened." (*Id*. at 3). Regarding Defendant Pritchard, Plaintiff argues that he did not bite anyone or try to bite anyone, therefore Pritchard's actions in taking him to the ground in the infirmary were completely unprovoked. (*Id*. at 4).

Plaintiff waives any argument on the *Heck* doctrine.[6] (*Id*. at 4).

In his Statement of Facts, Plaintiff disputes Defendants' statement that he never complained about the handcuffs being too tight, stating he told Reed they were too tight. (ECF No. 49 at 1). Plaintiff disputes that he attempted to kick his feet around while he was being carried to the infirmary. (*Id*. at 2). He alleges he remained limp. (*Id*.). Plaintiff disputes that he continued to yell "passive protest" while in the infirmary. Instead, he alleges that he was yelling at first, but stopped to talk to Nurse Gonzalez. (*Id*. at 2). Plaintiff disputes that he tried to spit at or bite anyone, and cites Nurse Gonzales' exam notes as support. (*Id*. at 2). He disputes that Defendant Pritchard tried to turn his head away before slamming him to the ground. (*Id*. at 2). Plaintiff disputes that he bit Defendant Pritchard, and disputes that he was yelling, screaming, and kicking while on the infirmary floor. (*Id*. at 2). He further notes that he was not charged with an assault or battery for attempted or actual biting and spitting. (*Id*. at 3). Finally, he disputes that there is no proof of injury, alleging there is a scar on his wrist and x-rays in his medical file.[7] (*Id*. at 3).

**Defendants' Reply to Plaintiff's Response**: Defendants note that Plaintiff raises a new claim against Defendant Pritchard in his Response; namely, that Pritchard failed to protect him

---

[6] Plaintiff's claims regarding his disciplinary charge and his placement in Isolation and Behavior Control are therefore waived and will be recommended for dismissal.
[7] No x-rays were provided for review by any party.

from other officers ramming his head into a door. (ECF No. 54 at 3-4). They note that this claim was raised without leave of the Court, and well after the deadline to amend pleadings had passed. (*Id*.).

Defendants argue Plaintiff has failed to demonstrate that excessive force was used against him. Instead, Plaintiff's actions created circumstances where it was necessary to restore order and maintain prison discipline. (*Id*. at 5). Defendants further argue that even if we assume, *arguendo*, that Plaintiff did not actually bite Defendant Pritchard, Plaintiff was still giving the appearance of that he was attempting to bite and/or spit on ADC personnel. (*Id*. at 5). Because the danger of spreading communicable disease through bodily fluids is high, the Arkansas legislature classified the expelling of or in any other way transferring of bodily fluids onto a correctional officer as a Class D felony in Ark Code Ann. § 5-13-211. (*Id*. at 5). As a result, Reed and Pritchard could not know that their actions involving Plaintiff violated any clearly established law. Instead, as Plaintiff chose to "accost senior ADC personnel, verbally assault them, raise his arm at them, and later conduct his personal protest," they are entitled to qualified immunity and a dismissal with prejudice. (*Id*. at 8).

**Plaintiff's Reply to Defendants' Reply**: Plaintiff agrees that he wants to add the claim that Defendant Pritchard failed to protect him.[8] (ECF No. 55 at 1). Plaintiff argues, for the first time in the case, that he fully believes that Defendant Pritchard actively participated in assaulting him, both in the infirmary and Isolation. He states he only used the word "probably" in the Complaint because he was concerned that if he wrote something he "didn't know for sure" and it proved to be incorrect, he would lose credibility. (*Id*. at 1). He further argues the Defense "cooked up this story, saying that I went mad, in order to avoid liability. It's a lie and it is purgery [sic]."

---

[8] As Defendants correctly argued, Plaintiff has not received permission to amend his Complaint, and the time to do so is long past. If Plaintiff wishes to file another Complaint to address this claim, he is free to do so.

(*Id*. at 1). Plaintiff points out that Defendants ignored the fact that he had already walked off and headed towards the barracks. They were simply "mad and beat me up in retaliation for cussing at their boss." (*Id*. at 1). Plaintiff asks the Court to note that he was not charged with a disciplinary for actual or attempted biting or spitting. (*Id*. at 2). Finally, Plaintiff argues that "everyone knows that you can't run an inmate's head into a door, everyone knows you can't choke slam an inmate while he's just sitting there, can't get any more bright line than that." (*Id*. at 2).

### A.  Official Capacity Claims

Plaintiff's official capacity claims are subject to dismissal. Plaintiff identifies Defendants Reed and Pritchard as employees of the Arkansas Department of Correction at the time of his allegations. States and state agencies are not "persons" subject to suit under § 1983. *Howlett v. Rose,* 496 U.S. 356 (1990); *Will v. Mich. Dept. of State Police*, 491 U.S. 58 (1989); *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008). "This bar exists whether the relief sought is legal or equitable." *Williams v. Missouri,* 973 F.2d 599, 599-600 (8th Cir. 1992) (citing *Papasan v. Allain,* 478 U.S. 265, 276 (1986)). "Congress did not abrogate constitutional sovereign immunity when enacting the law that was to become section 1983." *Burk v. Beene*, 948 F.2d 489, 493 (8th Cir. 1991) (citing *Quern v. Jordan,* 440 U.S. 332, 342 (1979)). "A suit against state employees in their official capacities is the functional equivalent of a suit against the State." *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2013). As Defendants were employees of the Arkansas Department of Correction at the time of the incident,[9] Plaintiff's official capacity claims against them are subject to dismissal.

---

[9] Defendant Pritchard's affidavit indicates that he is no longer employed with the ADC.

### B.  Excessive Force Claims

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). Relevant factors to be considered for this inquiry include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, . . .any efforts made to temper the severity of a forceful response," and the extent of injury to the inmate.  *Hudson*, 503 U.S. 7 (internal quotations omitted).

"Not every malevolent touch by a prison guard gives rise to a federal cause of action." *Jones,* F.3d at 495.  While significant injury is not required, "some actual injury must be shown" and the extent of inflicted pain considered.  *Id*.  "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).  "[U]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury."  *Johnson v. Bi-State J. Ctr./Arkansas Dept. of Corrections*, 12 F.3d 133, 136 (8th Cir. 1993).

There is no dispute that Plaintiff approached two ADC Wardens on October 19, 2017, cursed at them in a raised voice when he did not receive the desired answer to his questions, and raised his arm at them to "give them the finger."  There is also no dispute that Plaintiff then refused to walk to the infirmary for a pre-lockup medical examination, instead requiring ADC staff to carry him there while he yelled "passive protest" in order to "make his point."

14

**1. Excessive Force Claim - Defendant Reed**

Plaintiff's sole claim against Defendant Reed is that, after Plaintiff cursed the ADC Wardens in a raised voice, raised his arm at them, and "gave them the finger," Reed put handcuffs on Plaintiff "extra super tight" and crooked to cause Plaintiff pain. There is no dispute that the distance from where the handcuffs were applied to the infirmary was short. Plaintiff described it as "around the corner . . . wasn't very far." (ECF No. 37-1 at 15). Defendant Pritchard described it as no more than fifty feet. (ECF No. 37-4 at 2). Pritchard estimated it took three to four minutes to get to the infirmary because Plaintiff refused to walk. (*Id*.).

Plaintiff alleges in his Complaint that he has a permanent scar from the handcuffs applied by Reed, and his right hand intermittently goes numb. (ECF No. 5 at 5). In his deposition, Plaintiff testified that the handcuffs "rubbed the skin off or something," and stated that he had scars "for a long time," but there was no bleeding. (ECF No. 37-1 at 8-9).

Plaintiff's allegations and testimony indicating his right wrist was injured by the handcuffs are contradicted by Nurse Gonzalez's pre-lockup examination notes. These notes explicitly state that, at the time Plaintiff was in the infirmary, Nurse Gonzalez observed no wounds, bruises, abrasions, or other injuries. (ECF No. 37-5). Plaintiff has provided no copies of medical requests showing he asked for treatment for an injured wrist after the incident, and does not allege or testify that he asked for treatment for his right wrist either around the time of the incident or for ongoing chronic issues such as numbness.

The lack of any discernable injury to Plaintiff's wrist from Reed's application of handcuffs contradicts his allegation that Defendant Reed acted maliciously to cause him harm. "Not every malevolent touch by a prison guard gives rise to a federal cause of action." *Jones,* F.3d at 495. While significant injury is not required, "some actual injury must be shown" and the extent of inflicted pain considered. *Id*. "An inmate who complains of a 'push or shove' that causes no

discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38.  Regarding Plaintiff's allegations about "extra super tight" handcuffs, the Eastern District of Arkansas has addressed this issue, and held that an inmate who complained of "super tight" handcuffs to walk less than 100 feet, with no discernable injury, failed to state a valid constitutional claim sufficient to survive summary judgment.  *Sterling v. Taylor*, Case No. 5:16CV00120-JLH-JTK, 2017 WL 1511296, at *5 (E.D. Ark. Feb. 28, 2017), *report and recommendation adopted*, Case No. 5:16CV00120-JLH-JTK, 2017 WL 1528734 (E.D. Ark. Apr. 25, 2017), *aff'd as modified sub nom. The-Nimrod Sterling v. Taylor*, 710 Fed. App'x. 715 (8th Cir. 2018) (unpublished).

Here, it is clear from the summary judgment record that the handcuffs were applied in a good faith effort to maintain or restore discipline.  Plaintiff freely admits that he approached two ADC Wardens on October 19, 2017, cursed at them in a raised voice, and raised his arm at them to "give them the finger."  He argues that, because he then turned and walked away rather than continuing the altercation, no force was needed.  This argument is disingenuous, as Plaintiff violated ADC order and discipline with his initial disruptive insolence to ADC staff.  Indeed, in ADC Administrative Directive 14-42 - Behavior Control, disruptive behavior is defined as "a behavior that threatens the security and/or operations of the facility, encourages or incites a disruptive atmosphere, or creates a serious health hazard." (ECF No. 37-7 at 2).  Verbally assaulting two ADC Wardens with offensive language, combined with an aggressive and profane arm gesture, falls squarely under this definition.  The Eighth Circuit has repeatedly emphasized that "institutional security is the most compelling legitimate government interest in a prison setting."  *Simpson v. County of Cape Girardeau, Missouri*, 879 F.3d 273, 281 (8th Cir. 2018) (internal quotation omitted.)  Thus, whether Plaintiff continued to engage in insolent and disruptive behavior or walked away after "he said his piece" is irrelevant to the analysis.

16

Thus, no issue of genuine material fact exists as to Plaintiff's claim against Defendant Reed, and he is entitled to summary judgment as a matter of law.

### 2. Excessive Force Claims - Defendant Pritchard

Plaintiff also freely admits that he refused to walk to the infirmary, repeatedly yelling "passive protest" as he forced the staff to carry him there to "make his point." Plaintiff brings two claims of excessive force against Defendant Pritchard for actions taken during the trip to the infirmary and while inside the infirmary. For the first claim, Plaintiff alleges that, as he was being carried, several unknown officers and "probably Pritchard" ran his head in the closed and locked infirmary door "kind of like a battering ram" to cause him pain as they carried him. (ECF Nos. 5 at 5-6; 37-1 at 16). Plaintiff further alleges that Defendant Pritchard, without warning or provocation, choke-slammed him to the ground in the infirmary while Plaintiff was handcuffed. (ECF Nos. 5 at 6; 37-1 at 18; 48 at 4).

In his affidavit, Defendant Pritchard confirmed that he was one of the officers carrying Plaintiff to the infirmary. (ECF No. 37-4 at 2). Pritchard stated he held Plaintiff's feet while other officers held Plaintiff's arms to carry him to the infirmary during Plaintiff's protest. (*Id*.). Plaintiff alleges that officers attempted to "kick his feet around" while he was being carried. (*Id*.). Pritchard denies that Plaintiff was walked or thrust into any door or structure. (*Id*.). In contrast, Plaintiff testified that he remained limp while being carried, while continuing to yell "passive protest." (ECF No. 37-1 at 15; 48 at 2).

Plaintiff alleged no specific physical harm from being "rammed" into the door, and Nurse Gonzalez's examination revealed no wounds, bruises, abrasions, or other injuries to Plaintiff immediately after the incident. Plaintiff has also provided no evidence that he sought medical treatment for any resulting injury, either that day or at any time. Thus, his allegation that he was thrust into the door "like a battering ram" is contradicted by the summary judgment record.

Plaintiff's failure to allege any injury, combined with the actual lack of any discernable injury, contradicts his allegation that Defendant Pritchard acted maliciously and sadistically to cause him harm.[10]  *See Wilkins*, 559 U.S. at 38 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim."); *Jones*, F.3d at 495 (While significant injury is not required, "some actual injury must be shown").

For the second claim, Plaintiff alleges he was sitting handcuffed in a chair and talking calmly to Nurse Gonzalez when Defendant Pritchard grabbed him by the neck, lifted him in the air, and slammed him into the ground, breaking several ribs and crushing his right elbow.  Plaintiff alleges he lay still and quiet after he hit the ground, but Pritchard and other officers nonetheless jumped on him, putting knees in his ribs, kidneys, and neck, and using "joint manipulations" and pressure points to cause him pain without leaving bruises.  Plaintiff argues he did not bite or spit at anyone, and points out that he was not charged with a disciplinary for attempted or successful biting or spitting.[11]  (ECF Nos. 5 at 6; 37-1 at 18-25; 48 at 2,4; 55 at 2).

According to Defendant Pritchard's affidavit, Plaintiff continued to yell "passive protest" while seated in an infirmary chair as Nurse Gonzalez attempted to obtain his vital signs.  (ECF No. 37-4 at 3).  Plaintiff then began attempting to spit on or bite other people, including the nurse. (*Id.*).  In response, Pritchard used his left hand to attempt to turn his head away from the nurse and other staff to prevent him from spitting on or biting anyone.  (*Id.*)  Plaintiff then bit his left hand at the base of the palm near his pinky finger.  (*Id.*).  Pritchard then used both of his hands to "lift him up by his shoulders and/or upper body and then put inmate Stompingbear on the floor."  (*Id.*).

---

[10] It is also not entirely clear to the Court how Pritchard could have been the author of such an act when he carried Plaintiff's feet while two other ADC guards each carried one of Plaintiff's arms.

[11] Plaintiff was, however, immediately placed in Behavior Control.  According to Administrative Directive 14-42, inmates are placed in Behavior Control for only four reasons: assaultive, disruptive, or self-injurious behavior, or sexual misconduct.  (ECF No. 3707 at 2).

Pritchard kept both of his hands on Plaintiff's shoulders or upper body to pin him down so that other ADC officials could place restraints on Plaintiff and attempt to gain control of him. (*Id*.). He does not know what tactics the other officials used on him because he was focused on keeping Plaintiff on the ground. He did not, at any time, use joint manipulations or pressure points on Plaintiff, nor did he come into contact with his ribs, kidneys, or neck. (*Id*.). Plaintiff continued to yell, scream, and kick his legs around while on the ground. (*Id*.). Once Plaintiff was under some control, a spit mask was placed on him, and he was transported from the infirmary. (*Id*. at 4).

Plaintiff's statement that he was calm and compliant in the infirmary are contradicted by the summary judgment record to such an extent that no reasonable jury could believe it, particularly when paired with the disruptive and disobedient actions he freely admits to engaging in immediately prior to and after the infirmary. The medical encounter notes from Nurse Gonzalez indicate that Plaintiff came in yelling "passive protest," but was then briefly cooperative. Plaintiff then started directing profanity at an officer and made a biting motion towards the officer's hand. The nurse was unable to continue with the examination because Plaintiff became "uncooperative with officers." (ECF No. 37-5). The disciplinary charge states that Plaintiff attempted to bite and spit on officers in the infirmary, so he was taken to the floor and a spit mask applied. (ECF No. 37-6). Grievance investigation worksheets completed by two ADC staff present in the infirmary state that he "began to resist" (ECF No. 48-1 at 62) and attempted to spit on staff. (ECF No. 48-1 at 63). The Internal Affairs Use of Force Review indicates Plaintiff failed to comply with staff orders, and attempted to bit and spit on security staff in the infirmary, at which time he was taken to the floor and a spit mask applied. (ECF No. 48-1 at 65-66).

Thus, the application of force by Pritchard and others in the infirmary was necessary to restore order and discipline by subduing a persistently recalcitrant inmate who refused to follow

orders to walk to the infirmary, engaged in a loudly defiant protest stunt, and then attempted to assault ADC staff. Nor does anything in the summary judgment record indicate that the force used by Pritchard was repugnant to the conscience of mankind. Indeed, the Eighth Circuit has recognized that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 2000). "The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Thus, even if Plaintiff's elbow and ribs were injured in the take-down, the use of force was necessary and applied in a good faith effort to restore discipline.

Further, although Plaintiff alleges that he suffered broken ribs and an injured elbow in the take-down procedure, there is no medical evidence of either injury in the summary judgment record before the Court. Plaintiff himself testified that x-rays of his elbow showed no damage. (ECF No. 37-1 at 20). Although Plaintiff testified that he filed medical grievances concerning the incident, and was told by a doctor a week or so after the incident that he had broken ribs, (ECF No. 37-1 at 21, 44-45), neither medical grievances nor medical records concerning injured ribs have been submitted to the Court. The absence of any discernable injury in the summary judgment record, combined with the clear need to restore order and discipline, does not permit the inference that Pritchard acted maliciously and sadistically to cause harm to Plaintiff when he took him to the floor in the infirmary. *See Wilkins*, 559 U.S. at 38 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim."); *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) (pepper-spraying an inmate who disobeyed

orders and engaged in aggressive acts of defiance was not a case where "a complete absence of a penological purpose" raised "the reasonable inference that the officers acted maliciously in an effort to cause harm").

Accordingly, there is no genuine issue of material fact regarding Plaintiff's allegations of excessive force against Defendant Pritchard, and he is entitled to summary judgment as a matter of law.

### C. Summary

It is well-established in the Eighth Circuit that "unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Johnson v. Bi-State J. Ctr./Arkansas Dept. of Corrections*, 12 F.3d 133, 136 (8th Cir. 1993). Nothing in the summary judgment record supports a reliable inference of wantonness in the infliction of pain for any of the three excessive force incidents alleged by Plaintiff. Instead, the record displays a persistently recalcitrant inmate who verbally assaulted two ADC wardens with offensive language, raised his arm at them in an aggressive and profane gesture, refused to obey orders to walk to the infirmary, engaged in a loudly defiant protest stunt, and then attempted to physically assault ADC staff. Except for the attempted physical assault, Plaintiff freely admits to all of the above actions, and his allegations concerning the physical assault are blatantly contradicted by the summary judgment record. There is, therefore, no material dispute that Plaintiff needed to be subdued to restore order and discipline, or that the force was applied in a good faith effort to do so. This case, therefore, is not one that should go to a jury. As was so aptly stated by the Seventh Circuit:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.... Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009).

### IV. CONCLUSION

Accordingly, I recommend that Defendants' Motion for Summary Judgment (ECF No. 37) be **GRANTED** and Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **16th day of July 2020**.

/s/ *Barry A. Bryant*
_____
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE